**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division**

MELISSA S. SHIFFLETT and
BRENT A. SHIFFLETT,

                              Plaintiffs,

v.

SPECIALIZED LOAN SERVICING, LLC,

                            Defendant.

Civil Action No. 5:19-cv-00016-EKD

## AMENDED COMPLAINT

COME NOW Plaintiffs, Melissa S. Shifflett and Brent A. Shifflett ("Plaintiffs"), pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, by counsel, and file this Amended Complaint against Defendant, Specialized Loan Servicing, LLC ("SLS"). In support of their Amended Complaint, Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.      As the entities that perform the day-to-day management of loans on behalf of lenders and investors, "servicers can have a direct and profound impact on borrowers."[1] This case exemplifies the devastating impact that abusive servicing practices can have on homeowners.

2.      Here, Plaintiffs are facing the foreclosure of their home solely because of SLS's inability or unwillingness to perform basic servicing functions including accepting payments and maintaining accurate records concerning Plaintiffs' payments and mortgage.

---

[1] *See* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696, 10699 (Feb. 14, 2013) (codified at 12 C.F.R. pt 1024) [hereinafter 2013 Regulation X Amendments].

3.     To be clear, Plaintiffs' home is currently threatened by foreclosure despite their willingness and ability to make their monthly payments. Plaintiffs actively attempted to make full payments each month but were thwarted by either SLS's incompetence or bad faith in executing its servicer duties.

4.     A homeowner should not have to file a lawsuit in order to correct an accounting error in the records of his or her loan servicer. Indeed, Congress enacted the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617, in part, to protect consumers from the type of abusive and inaccurate servicing practices used by SLS in servicing Plaintiffs' account. Consistent with its consumer protection purposes, RESPA imposes mandatory duties on mortgage servicers, including investigative duties when responding to a borrower's belief that his or her account is in error. 12 U.S.C. § 2605.

5.     In this case, the errors on the Shiffletts' home mortgage account should have been resolved by a simple phone call. Instead, the Shiffletts repeatedly contacted SLS to resolve discrepancies in SLS's representations regarding the status of the account and the amount that was due. Because of SLS's inability to resolve its own errors, the Shiffletts are now behind on their mortgage; have been charged unnecessary late fees, default related fees, and interest; and are facing foreclosure of their home.

6.     RESPA provides for actual damages, statutory damages, costs, and attorney's fees for violations of certain mortgage servicer duties. The imposition of civil liability on servicers for the damage caused by their violations of the requirements of RESPA is essential to achieve the consumer protection purposes of RESPA because home mortgage servicers are incentivized "to look for opportunities to impose fees on borrowers to enhance revenues."[2] Indeed, this case is

---

[2] *Id.*

exemplary of the far reaching consequences noncompliance with RESPA can have on a homeowner while a servicer has profited from assessing late fees and other charges on the borrower's account.

7.      Accordingly, Plaintiffs allege a claim against SLS for its violations of RESPA, 12 U.S.C. § 2605(e)(2) for its failure to appropriately respond to Plaintiffs' qualified written request and correct the errors on their mortgage account. Plaintiffs also allege a claim against SLS for its repeated failure to perform standard servicer duties, including SLS's failure to correct errors relating to the allocation of payments on their account in violation of RESPA, 12 U.S.C. § 2605(k). Additionally, Plaintiffs allege a class claim against SLS for its failure to provide Plaintiffs with the appropriate notice upon receiving their qualified written request in violation of RESPA, 12 U.S.C. § 2605(e)(1).

8.      Plaintiffs allege claims against SLS for its violations of the FDCPA, 15 U.S.C. §§ 1692e and 1692f for its conduct of making false and misleading representations regarding the mortgage account and employing unconscionable and deceptive means in its collection on Plaintiffs' mortgage account. Plaintiffs also allege a claim for fraud.

## JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, 12 U.S.C. § 2605(f), and 15 U.S.C. § 1692k. The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District and Division.

## PARTIES

11.     Plaintiffs are natural persons residing in this District and Division.

12.     SLS is a foreign company authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia. At all times relevant to this Complaint, SLS was a mortgage loan servicing company governed by RESPA and a debt collector governed by the FDCPA because SLS treated the loan as in default at the time it took over servicing of the loan.

## BACKGROUND

### *SLS's Servicing of the Shiffletts' Home Loan*

13.     In August 2012, the Shiffletts received a Chapter 7 discharge in bankruptcy.

14.     The Shiffletts continued to make monthly payments on their home mortgage to Bank of America Home Loans, including their February 2017 payment.

15.     In February 2017, the servicing of their home loan was transferred from Bank of America Home Loans to SLS.

16.     The Shiffletts received a notice from SLS in February 2017 informing them that Bank of America would stop accepting their payments on February 14, 2017 and that "SLS will start accepting payments from you on February 15, 2017." The notice also offered monthly automatic payment drafting.

17.     The Shiffletts contacted SLS regarding their mortgage payments and to set up automatic payments. They were informed by an SLS representatives over the phone that SLS would not accept any payment on the account until April 2017 and that the Shiffletts could not set up automatic payments or request monthly statements until April 2017.

18.     Nonetheless, in March 2017, SLS sent the Shiffletts a "Notice of Default and Notice of Intent to Foreclose" on the Shiffletts home, incorrectly claiming that the Shiffletts had failed to pay their January, February, and March payments.

19.     The March 2017 Notice of Default demanded the Shiffletts to pay $1,803.24, which upon information and belief, included late charges.

20.     SLS also charged a late fee to the Shiffletts' account in March even though the Shiffletts timely paid their February payment to Bank of America.

21.     In April 2017, the Shiffletts paid the $1,803.24 to SLS, which SLS informed them would cover their mortgage payments for the months of February, March, and April.

22.     Nonetheless, the Shiffletts were subsequently charged a fee for default related services.

23.     And, in May 2017, SLS sent the Shiffletts a "Notice of Default and Notice of Intent to Foreclose" incorrectly claiming that the Shiffletts failed to pay their April 2017 payment and demanding $1,107.67, which upon information and belief, included late charges.

24.     The Shiffletts contacted SLS regarding the May 2017 Notice of Default and were informed that their account was current, that they owed $555.09 for the month, and to disregard the Notice of Default.

25.     Because the Shiffletts had still not received a monthly statement from SLS, they contacted SLS in June 2017 to make their payment and check on the status of their account. They made a payment of $548.16, which they were told brought their account current. The Shiffletts requested that SLS send them monthly statements and were told that the statements should begin arriving soon.

26.     Nonetheless, SLS charged a property inspection fee to the Shiffletts' account.

27.     And, in July 2017, SLS sent the Shiffletts a "Notice of Default and Notice of Intent to Foreclose" erroneously providing that their loan was in default as a result of their failure to make their June 2017 payment and demanding $1,120.66, which upon information and belief, included late charges.

28.     The Shiffletts contacted SLS regarding the July 2017 Notice and were informed by an SLS representative that their account was current and that they did not need to make a payment at that time. The Shiffletts informed SLS that they were still not receiving the requested monthly statements.

29.     Nonetheless, SLS charged a property inspection fee to the Shiffletts' account.

30.     And, the Shiffletts received another "Notice of Default and Notice of Intent to Foreclose" in August 2017.

31.     The Shiffletts contacted SLS and were told that they failed to make a July payment. The Shiffletts made a $1,120.66 payment, which they were informed would cover their July and August payments.

32.     Because the Schiffletts were still not receiving monthly statements, they called to inquire about their September 2017 payment. They made a payment of $548.16 at the instruction of SLS.

33.     Nonetheless, SLS charged a property inspection fee to the Shiffletts' account.

34.     And, in October 2017, SLS sent the Shiffletts another "Notice of Default and Notice of Intent to Foreclose," incorrectly claiming that the Shiffletts failed to make their September 2017 payment and demanding $1,109.67, which included late charges, to bring their account current.

35.     The Shiffletts contacted SLS regarding the October 2017 Notice of Default and were informed that their account was current and, in fact, that they had overpaid on their account earlier in the year.

36.     Nonetheless, SLS charged a property inspection fee to the Shiffletts' account.

37.     Because the Shiffletts were still not receiving monthly statements, they called to inquire about the status of their account in November 2017. Even though they were previously informed of an overpayment on their account, the SLS representative informed them that they needed to make a $571.65 payment to cover their October 2017 payment, which the Shiffletts made at that time.

38.     Nonetheless, later in November 2017, the Shiffletts received another "Notice of Default and Notice of Intent to Foreclose" erroneously indicating that they failed to pay their October 2017 payment and demanding $1,138.94, which upon information and belief included late charges, to bring their account current.

39.     The Shiffletts contacted SLS regarding the 2017 Notice of Default and were informed by an SLS representative that their account was current.

40.     Later in November 2017, the Shiffletts made a payment of $571.65 to SLS.

41.     Nonetheless, SLS charged a property inspection fee to the Shiffletts' account.

42.     And, in December 2017, SLS sent the Shiffletts another "Notice of Default and Notice of Intent to Foreclose" indicating that they failed to make their November payment and demanding $1,168.21, which upon information and belief, included late charges, to bring their account current.

43.     The Shiffletts contacted SLS regarding the 2017 Notice of Default and were told to disregard the notice; however, SLS charged a property inspection fee to the Shiffletts' account.

44. The Shiffletts made a payment of $571.65 to SLS in December.

45. Nonetheless, in January 2018, SLS sent the Shiffletts a "Notice of Default and Intent to Foreclose" indicating that they failed to make their December payment and demanding $1,179.56, which included late charges, to bring the account current.

46. The Shiffletts contacted SLS regarding the January 2018 Notice of Default. An SLS representative informed the Shiffletts that they did not need to make a payment because they had previously overpaid on their account. The SLS representative also informed them that SLS would not send the Shiffletts monthly billing statements because their mortgage was discharged in bankruptcy. Notwithstanding this representation from the SLS representative, SLS charged a property inspection fee to the Shiffletts' account.

47. In February 2018, the Shiffletts received a letter from SLS providing that the Shiffletts could elect to receive monthly periodic statements by filling out an attached form and sending it to SLS. The Shiffletts filled out the form and faxed it to SLS at the number designated on the form.

48. Even though the Shiffletts were informed by SLS that they did not need to make a payment in January, they were informed by an SLS representative in February 2018 that their account was delinquent and that $2,046.76, including late charges, was due.

49. Additionally, SLS charged multiple property inspection fees to the Shiffletts' account in February 2018.

50. The Shiffletts made the payment of $2,046.76 in February 2018. However, after making the payment, they were informed that they had made overpayments on their account and that they would not need to make another payment on the account until May 2018.

51.     Even though the Shiffletts were informed by SLS that their overpayments would cover their March and April payments, they received a Delinquent Notice from SLS on or around April 13, 2018.

52.     On or around April 13, 2018, the Shiffletts spoke with an SLS representative who indicated that SLS did not receive payments for March and April 2018. The SLS representative indicated that the issue would be resolved by the application of the unapplied funds for the March and April 2018 payments.

53.     Nonetheless, on or around April 17, 2018, SLS sent the Shiffletts a "Notice of Default and Intent to Foreclose." The Default Notice erroneously indicated that the Shiffletts failed to make their March 2018 payment and demanded $1,161.22 to cover their March and April payments. Upon information and belief, this amount included late charges and other fees.

54.     The Shiffletts contacted SLS regarding the April 2018 Notice of Default and were instructed to disregard the Notice. In spite of this representation from the SLS representative, SLS charged a property inspection fee to the Shiffletts' account.

55.     The Shiffletts made their May 2018 payment by mailing a check to SLS at the address designated by SLS for payments.

56.     On or around May 16, 2018, the Shiffletts contacted SLS and were informed that SLS had not received the Shiffletts' May 2018 payment.

57.     On or around May 17, 2018, the Shiffletts contacted SLS and were informed that SLS had still not received the check in the mail.

58.     On or around May 22, 2018, the Shiffletts contacted SLS and were informed that SLS had still not received their check in the mail. However, because there was an overpayment on

their account, SLS indicated that the overpayment would be applied to cover their May 2018 payment.

59.     Nonetheless, SLS charged a property inspection fee to the Shifflett's account, and on or around May 31, 2018, SLS sent the Shiffletts a "Notice of Default and Notice of Intent to Foreclose" indicating that they had failed to make their April 2018 payment and demanding $1,536.48 to cover their April and May payments.

60.     In May 2018, the Shiffletts received a monthly periodic statement from SLS erroneously indicating that they failed to make their March, April, and May 2018 payments. The statement indicated that they owed $2,351.71 to cover their payments, late charges, and other fees from March through June 2018.

61.     On or around June 1, 2018, the Shiffletts contacted SLS and were informed that they owed $571.65. The Shiffletts paid the $571.65 to SLS.

62.     On or around June 8, 2018, the Shiffletts mailed another payment to SLS.

63.     Nonetheless, SLS sent the Shiffletts a "Notice of Default and Notice of Intent to Foreclose" on June 19, 2018 providing that the Shiffletts failed to make their May payment and owed $1,554.40 to cover their May and June payments.

64.     The Shiffletts contacted SLS on or around June 19, 2018, and the SLS representative was unable to determine the amount that was due on their account.

65.     On or around June 28, 2018, the Shiffletts contacted SLS's Customer Escalation Department. However, an SLS representative refused to discuss their account with them.

66.     The Shiffletts mailed SLS their July payment, but SLS refused to accept the payment.

67.     SLS recommended that the Shiffletts apply for a home loan modification to cure the alleged default amount but denied the Shiffletts' application.

68.     The Shiffletts applied for a home loan modification a second time but were denied on or around December 24, 2018 and were advised that they would only qualify for a short sale or deed in lieu of foreclosure.

69.     During the two years prior to filing the complaint, the Shiffletts relied on each of the representations of SLS and did as they were instructed by SLS.

70.      SLS has initiated the foreclosure process on the Shiffletts' home, and the sale is scheduled for Wednesday, March 27, 2019.

71.     Now, because of their reliance on SLS, the Shiffletts are at risk of foreclosure and stand to lose over $100,000 of equity in their home.

### *RESPA Provides Protections to Mortgage Loan Borrowers*

72.     "RESPA is a remedial consumer protection statute and imposes obligations upon servicers of federally related mortgage loans." 2013 Regulation X Amendments, *supra* at 10709.

73.     "Specifically, with respect to mortgage servicing, the consumer protection purposes of RESPA include responding to borrower requests and complaints in a timely manner, maintaining and providing accurate information, helping borrowers avoid unwarranted or unnecessary costs and fees, and facilitating review for foreclosure avoidance options." *Id.*

74.     Consistent with these purposes, RESPA imposes mandatory duties on mortgage servicers in responding to borrower inquiries. 12 U.S.C. § 2605(e).

75.     Upon receipt of a qualified written request, § 2605(e)(1) requires the servicer to acknowledge receipt of the request within 5 days.

76.     This acknowledgment is important to ensure that borrowers are able to receive information and correct errors in their mortgage accounts in a timely manner. Indeed, because the protections of RESPA's borrower inquiry procedures are not triggered unless a borrower submits a proper qualified written request to the correct address, the acknowledgment provides borrowers with notification that their qualified written request has been received by the servicer and will be investigated as required by RESPA.

77.     Section 2605(e)(2) requires the servicer to conduct an investigation and provide the borrower with a written explanation or clarification that includes: (1) the information requested by the borrower or an explanation of why the information requested is unavailable and (2) the name and telephone number of a servicer employee who can provide assistance to the borrower.

78.     A servicer that fails to comply with the requirements of § 2605(e) is liable to the borrower for each failure for actual damages and, in the case of a pattern or practice of noncompliance, additional damages of up to $2,000. 12 U.S.C. § 2605(f).

79.     These requirements and the corresponding civil liability were first added to RESPA in 1990 by the Cranston-Gonzalez National Affordable Housing Act as part of a broader effort to set a national housing policy so that every American family would be able to afford a decent home in a suitable environment. *See* Cranston-Gonzalez National Affordable Housing Act, Pub. L. No. 101–625, §§ 101, 102, 941, 104 Stat 4079 (1990).

80.     Initially, RESPA required servicers to provide acknowledgment of a qualified written request within 20 days, but in responding to the 2007-2008 financial crisis, Congress shortened the timeframe to 5 days. *See* 2013 Regulation X Amendments, *supra* at 10757. Additionally, Congress shortened the timeframe to provide a full investigative response from 60 days to 30 days. *Id.* at 10758.

81.     Also as part of its response to the 2007-2008 financial crisis, Congress further amended § 2605 by increasing penalties that servicers incur for violations of § 2605(e). *See id.* at 10709.

82.     Thus, the protections in RESPA, including § 2605(e), were specifically designed to ensure that borrowers have timely access to accurate information regarding their accounts, that borrowers are able to avoid unnecessary fees and charges, and that borrowers are able to explore all available options to avoid foreclosure of their homes. *See id.*

83.     RESPA's remedial nature provides a necessary incentive for mortgage servicers to comply with its requirements. *See* 2013 Regulation X Amendments, *supra* at 10701. Given the unique attributes of the servicing market, servicers are incentivized "to look for opportunities to impose fees on borrowers to enhance revenues." *Id.* The Bureau observed that servicers "earn revenue from fees assessed on borrowers, including fees on late payments, fees for obtaining force-placed insurance, and fees for services, such as responding to telephone inquiries, processing telephone payments, and providing payoff statements." *Id.* Thus, the imposition of civil liability on servicers for the damage caused by their violations of the requirements of RESPA is essential to achieve the statute's consumer protection purposes.

### *Plaintiffs Submitted a*
### *Qualified Written Request to SLS*

84.     The Shiffletts sent SLS a qualified written request, which SLS received on March 7, 2019 (the "Qualified Written Request").

85.     The Shiffletts sent the Qualified Written Request to SLS's designated address for these types of correspondences. The Qualified Written Request included their names and account number and specifically described the information that they sought and that their account was in error.

86.     The letter specifically stated that they were current on their account when it was transferred to SLS in February 2017, and it informed SLS that it was advising them over the phone that they were current on their mortgage while treating their account as in default.

87.     Plaintiffs Qualified Written Request also requested all invoices for all default related fees that SLS refused to delete from their account.

88.     SLS responded to the Qualified Written Request in a letter dated March 14, 2019.

89.     SLS's response falsely stated that the Shiffletts did not send their Qualified Written Request to the address designated by SLS for qualified written requests, even though the Shiffletts sent their Qualified Written Request to the address designated by SLS.

90.     SLS's letter stated, "We note that your inquiry was not sent to the address established in writing by SLS that must be used by a borrower to submit a request for information or notice of error. As a courtesy, we are designating your inquiry as general correspondence and responding accordingly."

91.     SLS refused to provide the Shiffletts with the invoices for default-related fees assessed to their account. Without this information, the Shiffletts are unable to determine whether their account has been charged the appropriate amount for any default related services.

92.     SLS also failed to uncover the errors in the Shiffletts' mortgage account in responding to their Qualified Written Request.

**COUNT ONE:**
**VIOLATION OF RESPA, 12 U.S.C. § 2605(e)(1)**
**(CLASS CLAIM)**

93.     Plaintiffs incorporate each of the allegations set forth in the preceding paragraphs.

94.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

All individuals located in the United States of America who sent a qualified written request to the address designated by SLS for such correspondence and who SLS responded to with a letter incorrectly stating that the letter was not sent to the proper address.

Plaintiffs are members of the class.

95. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by SLS, and the class members may be notified of the pendency of this action by published and/or mailed notice

96. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include whether SLS's noncompliance with 12 U.S.C. § 2605(e)(1) is a part of a pattern or practice of noncompliance and whether SLS's conduct violates 12 U.S.C. § 2605(e)(1).

97. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

98. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are an adequate representative of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. They have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the

members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

99.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by SLS's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

100.    As alleged, Plaintiffs submitted their Qualified Written Requests to SLS, and SLS received the request.

101.    In violation of 12 U.S.C. § 2605(e)(1), SLS failed to send Plaintiffs a notice acknowledging receipt of their Qualified Written Request.

102.    Instead, SLS falsely claimed that Plaintiffs failed to send their request to the correct address and thus SLS designated their Qualified Written Request as general correspondence.

103.    As a result of SLS's violations of 12 U.S.C. § 2605(e)(1), Plaintiffs suffered concrete and particularized harm including deprivation of information they are legally entitled to protect their interests in their home; the cost of postage; aggravation; and other emotional distress.

104.     Upon information and belief, SLS's noncompliance with 12 U.S.C. § 2605(e)(1) is a part of a pattern or practice of noncompliance with 12 U.S.C. § 2605(e)(1).

105.     Plaintiffs and the members of the class are entitled to recover actual damages, statutory damages, costs, and attorney's fees from SLS for its violations of 12 U.S.C.§ 2605(e)(1) in an amount to be determined by the Court pursuant to 12 U.S.C. § 2605(f).

## COUNT TWO:
## VIOLATION OF RESPA, 12 U.S.C. § 2605(e)(2)
## (INDIVIDUAL CLAIM)

106.     Plaintiffs incorporate each of the allegations set forth in the preceding paragraphs.

107.     SLS failed to conduct an adequate investigation in responding to Plaintiffs' Qualified Written Request; failed to make appropriate corrections, including failing to correct the accounting errors in their account and delete default fees from their account; and failed to provide the information requested by Plaintiffs in violation of 12 U.S.C.§ 2605(e)(2).

108.     Upon information and belief, SLS had documents and records within its own possession demonstrating that Plaintiffs made or attempted to make their payments each month and that SLS had provided Plaintiffs with conflicting and inaccurate information regarding the status of their loan, and SLS failed to review its own relevant records.

109.     In violation of RESPA, SLS's investigation did not fulfill its investigative obligations under 12 U.S.C. § 2605(e).

110.     SLS also refused to provide Plaintiffs with the invoices for default related services on their account in violation of 12 U.S.C.§ 2605(e)(2). The Shiffletts are still unsure as to the nature of the default related fees assessed to the account and whether the fees assessed were appropriate.

111.    Upon information and belief and based on SLS's repeated violations, SLS's noncompliance with 12 U.S.C. § 2605(e)(2) is a part of a pattern or practice of noncompliance with 12 U.S.C. § 2605(e).

112.    As a result of SLS's violations of 12 U.S.C. § 2605(e)(2) Plaintiffs suffered concrete and particularized harm including deprivation of information they are legally entitled to protect their interest in their home; unnecessary interest and fees on their mortgage account; and other emotional distress.

113.    Plaintiffs are entitled to recover actual damages, statutory damages, costs, and attorney's fees from SLS for each of its violations of 12 U.S.C.§ 2605(e)(2) in an amount to be determined by the Court pursuant to 12 U.S.C. § 2605(f).

**COUNT THREE:**
**VIOLATION OF RESPA, 12 U.S.C. § 2605(k)(1)(C)**
**(INDIVIDUAL CLAIM)**

114.    Plaintiffs incorporate each of the allegations set forth in the preceding paragraphs.

115.    SLS violated RESPA, 12 U.S.C. § 2605(k)(1)(C), by repeatedly failing to correct apparent payment allocation errors on Plaintiffs' mortgage account, as alleged herein.

116.    SLS also violated RESPA, 12 U.S.C. § 2605(k)(1)(C), by failing to accept Plaintiffs' mortgage payments (a standard servicer duty) when Plaintiffs were current on their mortgage and their payments were sufficient to cover the full amount due.

117.    As a result of SLS's repeated violations of 12 U.S.C. § 2605(k), Plaintiffs suffered concrete and particularized harm, including the incurring of unnecessary fees, late charges, and interest on their mortgage account, aggravation, and other emotional distress.

118.    In light of SLS's repeated violations, SLS's noncompliance with 12 U.S.C. § 2605(k) is a pattern and practice of SLS.

119.     Because of SLS's violations of RESPA, 12 U.S.C. § 2605(k), Plaintiffs are entitled to recover their actual damages, statutory damages in an amount not greater than $2,000 *per violation*, attorneys' fees, and costs pursuant to 12 U.S.C. § 2605(f).

### COUNT FOUR:
### VIOLATION OF FDCPA, 15 U.S.C. § 1692e
### (INDIVIDUAL CLAIM)

120.     Plaintiffs incorporate each of the allegations set forth in the preceding paragraphs.

121.     SLS treated Plaintiffs as in default when it took over servicing of the loans based on SLS's erroneous belief that Plaintiffs failed to make their January 2017 and February 2017 mortgage payments.

122.     SLS repeatedly violated 15 U.S.C. § 1692e(2) by falsely claiming that Plaintiffs defaulted on their mortgage and were delinquent on their account, when they were in fact current on their mortgage payments. Alternatively, SLS violated 15 U.S.C. § 1692e(2) by representing that Plaintiffs were current on their mortgage and did not need to make a payment, when in fact Plaintiffs needed to make a payment on their mortgage.

123.     Also, SLS repeatedly violated 15 U.S.C. § 1692e(5) by threatening late charges and its intent to foreclose on Plaintiffs' home when SLS had no legal right to do so because Plaintiffs were current on their mortgage.

124.     Also, SLS repeatedly violated 15 U.S.C. § 1692e(10) by using false representations and deceptive means to collect or attempt to collect on the loan, including but not limited to, overcharging Plaintiffs, misrepresenting that overpayments would cover Plaintiffs' future payments, refusing to accept Plaintiffs' payments, refusing to send Plaintiffs periodic statements, and providing Plaintiffs with conflicting and inconsistent information regarding the status of their mortgage.

125.    As a result of SLS's repeated violations of 15 U.S.C. § 1692e, Plaintiffs suffered concrete and particularized harm including the incurring of unnecessary fees, late charges, and interest on their mortgage account, aggravation, and other emotional distress.

126.    Based on SLS's noncompliance with § 1692e, Plaintiffs are entitled to recover actual damages, statutory damages, reasonable attorneys' fees, and costs, pursuant to 15 U.S.C. § 1692k.

**COUNT FIVE:**
**VIOLATION OF FDCPA, 15 U.S.C. § 1692f**
**(INDIVIDUAL CLAIM)**

127.    Plaintiffs incorporate each of the allegations set forth in the preceding paragraphs.

128.    SLS repeatedly violated 15 U.S.C. § 1692f by using unfair and unconscionable means to collect or attempt to collect a debt from Plaintiffs.

129.    SLS's noncompliance with 15 U.S.C. § 1692f included inducing Plaintiffs to overpay on their account, threatening to foreclose on Plaintiffs' home without any legal right to do so, collecting fees and charges from Plaintiffs that SLS was not contractually entitled to collect, refusing to accept Plaintiffs' payments when tendered, and refusing to provide Plaintiffs with monthly periodic statements when requested.

130.    As a result of SLS's repeated violations of 15 U.S.C. § 1692f, Plaintiffs suffered concrete and particularized harm including the incurring of unnecessary fees, late charges, and interest on their mortgage account, aggravation, and other emotional distress.

131.    Based on SLS's noncompliance with § 1692f, Plaintiffs are entitled to recover actual damages, statutory damages, reasonable attorneys' fees, and costs, pursuant to 15 U.S.C. § 1692k.

## COUNT SIX:
## FRAUD
## (INDIVIDUAL CLAIM)

132.     Plaintiffs incorporate each of the allegations set forth in the preceding paragraphs.

133.     SLS made numerous fraudulent representations to Plaintiffs regarding the status of their loan including but not limited to the amount that was due each month, including, but not limited to, each representation or omission detailed above and specifically incorporated herein in paragraphs 17 through 65.

134.     Alternatively, SLS omitted material information by not informing Plaintiffs of the amount they needed to pay to remain current on their mortgage in each phone call Plaintiffs made to SLS, including, but not limited to, each representation or omission detailed above and specifically incorporated herein in paragraphs 17 through 65.

135.     The representations and omissions made by SLS were untrue as evidenced by SLS now attempting to foreclose on their home.

136.     Plaintiffs relied on SLS's misrepresentations and omissions when they were told the amount to pay each month. If Plaintiffs had known of SLS's misrepresentations, they would have paid any alleged amount due.

137.     SLS also actively concealed the amount owed so that it could put Plaintiffs in default and recoup default related servicing charges such as late fees and other expenses.

138.     SLS knew, or should have known, that Plaintiffs were relying on its representations regarding the amount owed on their mortgage each month, particularly since it refused to send monthly mortgage statements or enroll them in automatic payments.

139.     SLS's representations regarding the amount due each month were false as is evidenced by its attempt to foreclose on Plaintiffs' home.

140.    SLS made these false statements of material facts with the intent to deceive Plaintiffs.

141.    SLS's actions were willful and done for its pecuniary benefit. As a result of SLS's conduct, actions and inaction, Plaintiffs have suffered actual damages, including incurring of additional debt secured by real property for default related servicing and the threatened foreclosure of their home.

142.    Plaintiffs are entitled to punitive damages because SLS's conduct was willful, wanton, malicious, and deliberate.

143.    In the alternative, if SLS made the misrepresentations identified above innocently or negligently, SLS made those misrepresentations with the intent that Plaintiffs rely on those representations.

144.    Plaintiffs relied on SLS's representations to their detriment and they have suffered damages due to SLS's conduct.

145.    Plaintiffs are entitled to recover their actual damages, punitive damages and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment for actual, statutory, and punitive damages against SLS; their attorneys' fees and costs; prejudgment and post-judgment interest at the judgment rate; and such other relief the Court deems proper

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**MELISSA S. SHIFFLETT and
BRENT A. SHIFFLETT**

By:_____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791

Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
**KELLY GUZZO, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of May, 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

By: *    /s/ Kristi C. Kelly*
Kristi C. Kelly, Esq., VSB #72791
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
*Counsel for Plaintiffs*